IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § § § | |
| Plaintiff, | § § | |
| v. | § § | Civil Action No. **3:10-CV-1632-L** |
| **BANK OF AMERICA, NATIONAL ASSOCIATION,** | § § § | |
| Defendant. | § § | |

## MEMORANDUM OPINION AND ORDER

Before the court is Defendant Bank of America, N.A.'s Motion for Summary Judgment (Doc. 53), filed February 22, 2013; Plaintiff's Motion to Partially Exclude the Expert Testimony of Stephen Ewald (Doc. 80), filed May 8, 2013; Defendant Bank of America, N.A.'s Motion to Exclude the Expert Testimony of Allison Taylor (Doc. 81), filed May 9, 2013; Plaintiff's Motion to Strike Notice of Supplemental Authority in Support of Defendant's Motion for Summary Judgment (Doc. 86), filed May 13, 2013; Defendant Bank of America, N.A.'s Motion to Compel Highland Capital Management, L.P. to Produce Documents and Resume the 30(b)(6) Deposition (Doc. 91), filed May 17, 2013; and Defendant Bank of America, N.A.'s Motion for Leave to File Reply Appendix in Support of Motion to Compel (Doc. 113), filed July 21, 2013.

After careful consideration of the motions, briefs, evidence, and applicable law, the court, for the reasons herein stated, **grants** Defendant Bank of America, N.A.'s Motion for Summary Judgment (Doc. 53) and **dismisses with prejudice** this action. Further, for the reasons herein

discussed, the court **denies** Plaintiff's Motion to Strike Notice of Supplemental Authority in Support of Defendant's Motion for Summary Judgment (Doc. 86).   In light of the court's determination as to Defendant's summary judgment motion, the court **vacates** the orders of reference as to Plaintiff's Motion to Partially Exclude the Expert Testimony of Stephen Ewald (Doc. 80), Defendant Bank of America, N.A.'s Motion to Exclude the Expert Testimony of Allison Taylor (Doc. 81), Defendant Bank of America, N.A.'s Motion to Compel Highland Capital Management, L.P. to Produce Documents and Resume the 30(b)(6) Deposition (Doc. 91), and Defendant Bank of America, N.A.'s Motion for Leave to File Reply Appendix in Support of Motion to Compel (Doc. 113), and **denies** them **as moot** except to the extent herein addressed.

## I.      Factual and Procedural Background

Plaintiff Highland Capital Management, L.P. ("Plaintiff" or "Highland") brought this lawsuit against Defendant Bank of America, National Association ("Defendant" or "BANA") alleging claims for breach of contract and promissory estoppel.  The action was originally filed in the 191st Judicial District Court of Dallas County, Texas, and subsequently removed by Defendant to federal court on August 20, 2010, based on diversity jurisdiction.

The central issue in this case is whether negotiations conducted by the parties' representatives on December 3, 2009, regarding the Regency loan bank debt transaction ("Regency Loan") resulted in a binding trade of the Regency Loan.[1]  Prior to December 3, 2009, an intermediary contacted Patrick Daugherty of Highland ("Daugherty")[2] in November 2009 on behalf of BANA to determine

---

[1] Unless noted, all facts herein set forth herein are undisputed.  If disputed, they are viewed in the light most favorable to Highland, as the summary judgment nonmovant.  Fed. R. Civ. P. 56.

[2] In November 2009, Daugherty was a partner at Highland and the head of distressed and private equity investments.

**Memorandum Opinion and Order – Page 2**

whether Highland was interested in purchasing the Regency Loan.  Daugherty subsequently spoke with Andrew J. Maidman ("Maidman"), the senior vice president of BANA's Special Assets Group ("SAG"), on December 3, 2009, regarding the Regency Loan.  During this telephone call, BANA agreed to sell $15,500,000 of the Regency Loan at a price of 93.5% of par "subject to appropriate consents and documentation." Shortly after the telephone call, Maidman stated again in an e-mail that the trade was "subject to appropriate consents and documentation." According to BANA, the "subject to appropriate consents and documentation" language used by Maidman indicates that the parties had not yet completed their negotiations and did not agree to be bound absent further consents and documentation.

Highland, on the other hand, contends the Maidman's and Daugherty's December 3, 2009 telephone conversation resulted in a binding oral agreement because the parties agreed to all material terms of the trade.  Highland therefore contends that the resulting trade was final, binding and not subject to further revision or negotiation by BANA.  Highland's belief in this regard is based in large part on its contention that the transaction was governed by industry standard, as well as the Standard Terms and Conditions for Par/Near Par Trade Confirmations published by the Loan Syndications and Trading Associate, Inc. ("LSTA Standard Terms").  Based on paragraph 21 of the LSTA, Highland contends that the Regency Loan trade is governed by standard LSTA terms because the parties had previously conducted trades subject to the LSTA.  Highland therefore contends that BANA was locked into the trade at the conclusion of the December 3, 2009 telephone call and thereafter could not insist on terms considered nonstandard in the industry and under the LSTA such as provisions that would limit BANA's liability for claims pertaining to the Regency Loan trade,

including potential claims resulting from BANA's failure to obtain the borrower's consent for the trade.

On December 27, 2010, BANA moved to dismiss Highland's contract and estoppel claims under Rule 12(b)(6) of the Federal Rules of Civil Procedure.  On November 7, 2011, the court granted Defendant's motion to dismiss as to Plaintiff's First Amended Complaint ("Complaint"). Highland timely appealed the court's decision.  On October 2, 2012, the Fifth Circuit affirmed the dismissal of Highland's estoppel claim, reversed the dismissal of Highland's oral contract claim, and remanded the case for further proceedings consistent with its October 2, 2012 opinion ("October 2012 Opinion").  On February 22, 2013, Defendant moved for summary judgment as to Highland's contract claim.  Defendant also objected to summary judgment evidence relied on by Highland. After briefing on BANA's summary judgment was complete, both parties filed motions to exclude the other's expert testimony under Federal Rule of Civil Procedure 702.  Highland also moved to strike BANA's notice of supplemental authority that was submitted after the summary judgment briefing was complete on the ground that BANA filed the notice without leave of court.

## II.    Motion for Summary Judgment Standard

Summary judgment shall be granted when the record shows that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986); *Ragas v. Tennessee Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998).  A dispute regarding a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  When ruling on a motion for summary judgment, the court is required to view all facts and inferences in the light most favorable to the

nonmoving party and resolve all disputed facts in favor of the nonmoving party. *Boudreaux v. Swift Transp. Co., Inc.*, 402 F.3d 536, 540 (5th Cir. 2005). Further, a court "may not make credibility determinations or weigh the evidence" in ruling on a motion for summary judgment. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000); *Anderson*, 477 U.S. at 254-55.

Once the moving party has made an initial showing that there is no evidence to support the nonmoving party's case, the party opposing the motion must come forward with competent summary judgment evidence of the existence of a genuine dispute of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586 (1986). On the other hand, "if the movant bears the burden of proof on an issue, either because he is the plaintiff or as a defendant he is asserting an affirmative defense, he must establish beyond peradventure *all* of the essential elements of the claim or defense to warrant judgment in his favor." *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986) (emphasis in original). "[When] the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine [dispute] for trial.'" *Id.* (citation omitted). Mere conclusory allegations are not competent summary judgment evidence, and thus are insufficient to defeat a motion for summary judgment. *Eason v. Thaler*, 73 F.3d 1322, 1325 (5th Cir. 1996). Unsubstantiated assertions, improbable inferences, and unsupported speculation are not competent summary judgment evidence. *See Forsyth v. Barr*, 19 F.3d 1527, 1533 (5th Cir.), *cert. denied*, 513 U.S. 871 (1994).

The party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his or her claim. *Ragas*, 136 F.3d at 458. Rule 56 does not impose a duty on the court to "sift through the record in search of evidence" to support the nonmovant's opposition to the motion for summary judgment. *Id.*; *see also*

*Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915-16 & n.7 (5th Cir.), *cert. denied*, 506 U.S. 832 (1992).  "Only disputes over facts that might affect the outcome of the suit under the governing laws will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248.  Disputed fact issues that are "irrelevant and unnecessary" will not be considered by a court in ruling on a summary judgment motion.  *Id*.  If the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to its case and on which it will bear the burden of proof at trial, summary judgment must be granted.  *Celotex*, 477 U.S. at 322-23.

## III.    BANA's Objections to Highland's Summary Judgment Evidence

Before dealing with the parties' substantive summary judgment arguments, the court addresses BANA's objections to Highland's summary judgment evidence.  In response to BANA's summary judgment motion, Highland relies in large part on the expert and rebuttal reports of Allison Taylor ("Ms. Taylor").  In its April 26, 2013 summary judgment reply brief (Doc. 77) and Objections to Plaintiff Highland Capital Management, L.P.'s Summary Judgment Evidence (Doc. 76), BANA objected to Highland's use of Ms. Taylor's expert reports as summary judgment evidence to raise a genuine dispute of material fact.  The parties dispute whether the expert reports can be properly considered under Federal Rule of Civil Procedure Rule 56 in deciding BANA's summary judgment motion.

BANA contends that the unsworn expert reports of Ms. Taylor are inadmissible hearsay and are not in a declaration, affidavit, or another form contemplated and permitted by Rule 56(c).  BANA asserts that although Ms. Taylor submitted a declaration attaching the reports, which states that the reports are true and correct copies, the declaration itself does not make the reports admissible

under Rule 56.  BANA also contends that many of Ms. Taylor's statements constitute impermissible

legal opinions and that she cannot possibly swear in good faith to all of the statements in her reports.

Highland disagrees that Ms. Taylor's declaration is insufficient to render her expert reports

admissible as summary judgment evidence:

> The Taylor Declaration states that the facts therein are within Ms. Taylor's "personal knowledge and are true and correct, and, if called as an expert witness, [she] could and would competently testify thereto." *See* Taylor Declaration [Dkt. No. 73-1] at 1.  Ms. Taylor then certifies that the exhibits attached thereto are "true and correct copies of the following," and lists each of the Taylor Reports.  *Id.* Ms. Taylor finally declares "under penalty of perjury that the foregoing is true and correct," and includes her signature.  *Id.* at 2.  Each of the Taylor Reports contains her signature and the date, as well as the information required for disclosure under FRCP 26, which makes her expert testimony admissible under FED. R. EVID. 702-705. *See* Taylor Reports [Dkt. No. 73-1] at 7-8, 25, 99, 101.  It is unclear under Defendant's construction of FRCP 56 what form a proper declaration supporting expert reports would take.  It is counterintuitive for Ms. Taylor to swear under penalty of perjury that the expert opinions contained in her reports are true and correct.

Pl.'s Resp. 4.  Based on *Straus v. DVC Worldwide, Incorporated*, 484 F. Supp. 2d 620, 633-34 (S.D.

Tex. 2007), Highland contends that there is "no defect in the manner the Taylor Reports were

presented as summary judgment evidence," and that a deficiency in the admissibility of an expert

report as summary judgment evidence can be cured by a supporting declaration filed subsequent to

any objection.  Pl.'s Resp. 4.

Even assuming that the declaration is defective, Highland contends that only the offending

portions of Ms. Taylor's reports should be excluded.  For support, Highland cites *Akin v. Q-L

Investments, Incorporated*, 959 F.2d 521, 531 (5th Cir. 1992), for the proposition that only

inadequate portions of an affidavit should be disregarded on summary judgment.  Highland further

asserts, based on *Capobianco v. City of New York*, 422 F.3d 47, 55 (2d Cir. 2005), that it is an abuse

of discretion for a district court to exclude a party's unsworn summary judgment evidence without

giving it an opportunity to cure the defect.  Highland therefore requests permission "to file an amended Declaration of Allison Taylor to remedy any procedural impropriety deemed by the Court." Pl.'s Resp. 6.

Highland misapprehends the requirements for evidence under Rule 56.  "Rule 56[] requires the adversary to set forth facts that would be admissible in evidence at trial. Material that is inadmissible will not be considered on a motion for summary judgment because it would not establish a genuine issue of material fact if offered at trial." *Duplantis v. Shell Offshore, Inc.*, 948 F.2d 187, 192 (5th Cir. 1991) (quoting *Geiserman v. MacDonald*, 893 F.2d 787, 793 (5th Cir. 1990)) (internal quotation marks omitted). Rule 56(c)(4) mandates that affidavits or declarations used in support of or opposition to a summary judgment motion be "made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). Thus, while evidence may be submitted in the form of an affidavit or declaration that ordinarily would not be admitted at trial, it must be submitted in a form permitted by Rule 56.  *Duplantis*, 948 F.2d at 192.

A trial judge's gatekeeping obligation to ensure that expert testimony is relevant and reliable applies to all expert testimony.  *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999).  The court construes this obligation as an affirmative duty to exclude expert testimony that does not meet this test.  In response to *Kumho and Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993),

Federal Rule of Evidence 702, which governs the admissibility of testimony by expert witnesses, was amended, effective December 1, 2000.  This rule provides as follows:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
(b) the testimony is based on sufficient facts or data;
(c) the testimony is the product of reliable principles and methods; and
(d) the expert has reliably applied the principles and methods to the facts of the case.

*Id.*

Expert testimony should not be considered if "the jury could adeptly assess [the] situation using only their common experience and knowledge." *Peters v. Five Star Marine Serv.*, 898 F.2d 448, 450 (5th Cir. 1990). The Fifth Circuit has held that if an expert's opinion offers no more than what a lawyer could offer in argument, it should be excluded. *In re Air Crash Disaster at New Orleans, La.*, 795 F.2d 1230, 1233 (5th Cir. 1986) ("[T]he trial judge ought to insist that the proffered expert bring to the jury more than the lawyers can offer in argument."). The commentary to Rule 702 similarly advises: "There is no more a certain test for determining when experts may be used than the commonsense inquiry whether the untrained layman would be qualified to determine intelligently and to the best possible degree the particular issue without enlightenment from those having a specialized understanding of the subject involved in the dispute." Fed. R. Evid. 702 advisory committee note. Further, the Fifth Circuit strongly admonishes district judges "to take hold of expert testimony" in federal cases. *In re Air Crash Disaster at New Orleans, La.*, 795 F.2d at 1234.

Ms. Taylor's declaration does not satisfy the aforementioned requirements. Ms. Taylor's declaration merely states:

1. My name is Allison Taylor. I am over the age of 18 and am competent to give this Declaration. The facts stated in this Declaration are within my personal knowledge and are true and correct, and, if called as an expert witness, I could and would testify competently thereto.

2. Each of the following exhibits as numbered below are true and correct copies of the following, which may be entered into evidence by Highland Capital Management, L.P.:

a. Exhibit A - Expert Report of Allison Taylor, dated February 5, 2013; and

b. Exhibit B - Rebuttal Expert Report of Allison Taylor, dated March 28, 2013.

3. The above listed exhibits have been made available to all parties in this matter.

I declare under penalty of perjury that the foregoing is true and correct.

Pl.'s App. 2-3.

As Highland acknowledges, Ms. Taylor's expert reports are signed and dated; however, they are not sworn or made under penalty of perjury. Thus, notwithstanding Ms. Taylor's one-page declaration, the court agrees with BANA that Ms. Taylor's reports fall outside the scope of competent summary judgment-type evidence. *See Provident Life & Accident Ins. Co. v. Goel*, 274 F.3d 984, 1000 (5th Cir. 2001) ("Unsworn expert reports . . . do not qualify as affidavits or otherwise admissible evidence for [the] purpose of Rule 56, and may be disregarded by the court when ruling on a motion for summary judgment."). Ms. Taylor's declaration filed in conjunction with the reports does not cure this deficiency because it merely states that her statements *in the declaration* are "true and correct" and made "under penalty of perjury."Pl.'s App. 2-3.  As to the expert reports, Ms. Taylor's declaration states only that they are "true and correct copies." *Id.*  Thus, unlike the statements in her declaration, the statements in Ms. Taylor's expert reports are unsworn and were not made under penalty of perjury.

Further, the court disagrees with Highland's assertion that the aforementioned deficiency in Ms. Taylor's declaration "is not decisively fatal to the admissibility of the Taylor Reports as competent summary judgment evidence [because] [c]ourts faced with this issue have permitted the party offering the challenged evidence to cure any defects in admissibility with a later-filed declaration." Pl.'s Resp. 6 (citing cases). While the court agrees that it has discretion to allow Highland the opportunity to cure the deficiency, it is not obligated to do so. Moreover, the circumstances of this case do not justify permitting Plaintiff's request to amend Ms. Taylor's declaration.[3]

After carefully reviewing the expert reports, the court determines that an amended declaration by Ms. Taylor swearing to the matters in her reports or stating that they are made under penalty of perjury would not make Ms. Taylor's reports admissible because they are deficient for other reasons. As noted above, supporting affidavits or declarations must "be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). While Ms. Taylor's declaration states that the matters *in her declaration* are based on personal knowledge, the declaration itself contains no

---

[3] The cases cited by Plaintiff in which the courts permitted amendments to summary judgment evidence to cure deficiencies do not stand for the proposition that the court **must** give Highland an opportunity to amend Ms. Taylor's declaration in an attempt to make her expert reports admissible. While the court in *Capobianco* concluded that the district court abused its discretion in excluding summary judgment evidence and ruling in favor of the defendant summary judgment movant, it did so because the court *sua sponte* excluded the unsworn expert reports at issue without any objection by the defendant. More importantly, the reports were submitted by the defendant rather than the plaintiff, the reports were favorable to the plaintiff, and one of the reports was not inadmissible hearsay, as it was admissible to show the plaintiff's supervisor's state of mind in terminating the plaintiff's employment. Accordingly, *Capobianco* is distinguishable from this case, and, in any event, the Second Circuit opinion is not binding on this court in ruling on the adequacy of Highland's summary judgment evidence under Rule 56 or the parties' Rule 702 expert objections, as these pertain to procedural, not substantive matters of law.

statements of substance and says nothing about whether Ms. Taylor has personal knowledge of the numerous factual matters set forth in her reports. *See, e.g.*, Pl.'s App. 9-13, ¶¶ 14-25.

For example, Ms. Taylor states in her report: "On December 3, 2009, Patrick Daugherty of Highland placed a phone call to Mr. Maidman *in order to finalize the purchase of the Regency Loan*." *Id.* 10, ¶16 (emphasis added).[4] Ms. Taylor also states that December 7, 2009, is the first time that BANA "indicated it might refuse to close the Regency Loan Trade using standard practices and procedures." *Id.* 12, ¶ 20. As herein discussed, however, this statement is directly contrary to the deposition testimony of Daugherty, Highland's star witness, who testified that he was aware from the outset that the Regency Loan was "atypical" in that he was not dealing with traders, and that he understood the trade would not be handled in the customary manner. *Id.* 182. Additionally, Daugherty testified that Maidman stated during their December 3, 2009 conversation, "We have our own docs," although Daugherty acknowledged that he misinterpreted this statement to mean LSTA standard documents. Pl.'s App. 191.

Ms. Taylor goes on to state that on December 9, 2009, BANA sent Highland draft assignment documentation that was "rife with terms that greatly varied from standard industry practice," including payment of attorney's fees for the Regency Loan trade, that were not previously discussed during the December 3, 2009 telephone call. *Id.* 12, ¶ 21. Again, this statement is contrary to the testimony of Daugherty who stated that he thought the issue of legal fees was discussed on December 3, 2009, and even if it was not, it was an insignificant matter. Ms. Taylor also states in argumentative fashion that BANA withdrew the trade confirmation executed on December 11, 2009,

---

[4] To support this statement, Ms. Taylor cites HCM2 001540 and HCM2 001481, which do not appear to be part of the summary judgment record. *Id.* n.13.

**Memorandum Opinion and Order – Page 12**

"ostensibly in order to avoid confusion, but more likely because, that same day, [BANA] was informed by the Regency Loan borrower that the borrower would not be giving its consent to assignment of the Regency Loan."[5] *Id.* 13, ¶ 23 (footnote omitted).  These and the other examples herein referenced are merely illustrative and representative samplings of the issues gleaned from Ms. Taylor's report and are by no means a complete recitation of the court's concerns.

Further, the reports contain no information that would allow the court to conclude that all of the matters in them, and in particular, Ms. Taylor's statements regarding the specific facts of this case and the Regency Loan transaction, are based on her personal knowledge.  Ms. Taylor acknowledges in her initial report that her opinions and the statements in the report are based not on personal knowledge but instead on her review of the pleadings in this case, documents produced in discovery, and discussions with Highland's counsel.  Thus, Ms. Taylor does not have personal knowledge of the numerous factual statements in her reports, and she is not competent to testify regarding such matters.  Moreover, Highland's pleadings and any statements by counsel relied on by Ms. Taylor constitute arguments by counsel, not evidence.

Ms. Taylor's reports are also inadmissible for other reasons. They are full of improper commentary regarding the evidence, the veracity, accuracy, and correctness of witness statements and testimony, the parties' state of mind or motives, and the propriety of the parties' conduct during the events at issue.  For example, in addition to the statements already discussed, Ms. Taylor states that "[t]he evidence I have seen indicates that both Highland and [BANA] expected that LSTA Standard Terms would govern the Regency Loan dealings," and that BANA's "internal

---

[5] For support, Ms. Taylor cites BANA  008665, which does not appear to be part of the summary judgment record.  *Id.* n.34.

documentation and communications prior to the Regency Loan Trade indicate that [it] fully intended to conduct the trade using standard LSTA operating procedure by having its loan sale department close the trade normally." *Id.* 18, ¶ 47. Ms. Taylor similarly states: "[BANA]'s actions after the Regency Loan occurred [on September 3, 2009,] indicate that [BANA] conceded that the LSTA Standard Terms would be applicable to the trade." *Id.* 19, ¶ 49. Ms. Taylor further states that the proposed terms of BANA's draft assignment documentation were "unusual, unilateral, and unreasonable," *Id.* 21, ¶ 57, and that "it appears that after [BANA] was informed that the Regency Loan borrower would not give its consent to the assignment . . . [BANA] attempted to break the trade by adding the non-standard language in the trade confirmation on December 20, 2009." *Id.* 22, ¶ 62.

Expert testimony in this regard is not admissible because it invades the jury's role in weighing the evidence and making credibility determinations.[6] Ms. Taylor's opinions regarding the law that governs this case and the application of New York law, the statute of frauds, and the LSTA are also improper, as these are questions of law for the court to decide. Highland contends that these and other opinions of Ms. Taylor are not legal arguments and do not dictate a legal result but instead merely provide industry background to BANA's actions. Pl.'s Resp. 16-17 (Doc. 84). Ms. Taylor's opinions, however, go far beyond providing background information regarding industry standards and application of the LSTA in the industry.

---

[6] *See United States v. Beasley*, 72 F.3d 1518, 1528 (11th Cir. 1996) ("Expert . . . testimony concerning the truthfulness or credibility of a witness is generally inadmissible because it invades the jury's province to make credibility determinations."); *Wescott v. Crinklaw*, 68 F.3d 1073, 1076 (8th Cir. 1995) ("Federal Rule of Evidence 702 permits expert testimony when scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue. However, [a]n expert may not go so far as to usurp the exclusive function of the jury to weigh the evidence and determine credibility. Nor may an expert pass judgment on a witness'[s] truthfulness in the guise of a professional opinion.") (internal citations and quotation marks omitted).

In addition to opining that New York law and the LSTA govern the parties' dispute and the December 3, 2009 transaction involving the Regency Loan, Ms. Taylor concludes in her reports that: (1) BANA waived any statute of frauds defense; (2) the Regency Loan trade constituted a binding contract or trade; (3) BANA waived the right to add nonstandard terms or conditions to the Regency Loan trade by failing to reserve any such terms or conditions at the time of the trade; (4) Highland had no obligation to accept the terms proposed by BANA as to the Regency Loan trade; (5) under the LSTA, after the borrower refused to consent to assignment of the Regency Loan, BANA was obligated to close it as a participation; and (6) BANA had no right to walk away from the December 3, 2009 oral agreement regarding the Regency Loan and its refusal to close it as a participation constituted a breach of industry practice, the LSTA, and the parties' contract.[7]   Such opinions constitute impermissible legal conclusions or arguments that invade the province of the court and jury and are not proper summary judgment evidence. *Cutting Underwater Technologies USA, Inc. v. Eni U.S. Operating Co.*, 671 F.3d 512, 515-16 (5th Cir. 2012).   In effect, Ms. Taylor attempts, through her expert reports, to fulfill the role of fact witness, judge, and jury, and, as noted, her reports are replete with statements that amount to nothing more than arguments of counsel.

Further, the expert reports of Ms. Taylor are inadmissible because they do not meet the predicate requirements of Rule 702.   Nowhere in Ms. Taylor's declaration or either of the expert reports is there any statement that her testimony is the product of reliable principles and methods or that she has applied the principles and methods reliably to the particular facts to this case.   Likewise,

---

[7] When Ms. Taylor was deposed, she acknowledged that by concluding in her report that BANA breached industry practice and the LSTA, she was in essence opining that BANA breached the Regency Loan trade or contract with Highland, which is the precise substance of Highland's contract claim in this case.  Pl.'s App. 119-122.

nothing in the reports or declaration indicates that an expert in Ms. Taylor's field would reasonably rely on the type of facts or data set forth in her reports. *See* Fed. R. Evid. 702.

Given the posture of this case and the stage of the litigation, the court concludes that it would unduly prejudice BANA and disruptive of the court's docket to give Highland an opportunity to remedy the deficiencies in Ms. Taylor's reports. While Highland was previously able to rely on its pleadings to stay in the game, it was on notice when this case was remanded that it would no longer be able to do so at the summary judgment stage. The court has extended the discovery, dispositive motion, and expert deadlines, and the trial of this case a number of times to permit the parties to adequately prepare their respective cases. At Highland's request, the court also extended its deadline to respond to BANA's summary judgment motion, and as a result, Highland had a total of 49 days to respond to the motion, which is well beyond the 21 days normally permitted for responses to motions under this district's Local Civil Rules. *See* LR 7.1(e). Highland, however, has presented no explanation as to why it was unable, in the 49 days it had to respond to BANA's summary judgment motion, to present Ms. Taylor's expert opinions in an affidavit, declaration or other form permitted by Rule 56, and in a manner that would make her opinions admissible and competent summary judgment evidence. Rather than seeking leave to amend immediately after BANA objected to Ms. Taylor's declaration and expert reports, Highland waited an additional 21 days and buried the request to amend Ms. Taylor's declaration in its response to BANA's objections.

Moreover, permitting Highland to amend Ms. Taylor's one-page declaration as proposed would not cure the defects in her reports or make them competent summary judgment evidence. Notably, Highland has not requested to amend Ms. Taylor's expert reports, and has instead taken the

position that the reports are admissible as presented. Alternatively, if portions of the reports are inadmissible, Highland suggests that the court can simply strike the inadmissible portions.

This argument is specious. This is so because the expert reports are riddled with legal deficiencies, and the deficiencies are inextricably intertwined with the substance of both reports. Even if the court could strike only the offending portions of the reports, little, if any, substance would remain as to expert testimony to raise a genuine dispute of material fact regarding the existence of a contract. The reports, as they presently exist, would require a major overhaul and significant amount of time to cure the numerous legal deficiencies.

Although Highland has not requested to amend Ms. Taylor's expert reports, the court notes that allowing it to do so would unduly prejudice BANA by necessarily imposing additional and avoidable costs in the form of extensive amended briefing on Defendant's summary judgment objections and motion to exclude Ms. Taylor's expert reports (and possibly additional discovery) that would unnecessarily delay the trial and resolution of this case until sometime in 2014 or perhaps beyond. The nature of this prejudice does not render it curable by a continuance at this late stage. Moreover, after the briefing on BANA's summary judgment was complete, Highland strenuously objected, based on the fast-approaching September 2013 trial date, to a similar recent request by BANA to amend its answer, even though the substance of the proposed amendment was known and had been at issue since the commencement of the case. The court denied BANA's request to amend its answer at this late juncture, and fair play and consistency demand the same result regarding Plaintiff's eleventh-hour request to amend Ms. Taylor's declaration. Accordingly, based on the foregoing considerations, the court **sustains** BANA's objections to Ms. Taylor's declaration and expert reports, to the extent herein discussed, and **denies** Plaintiff's request to amend Ms. Taylor's

declaration.[8]  Accordingly, the court will not consider Ms. Taylor's declaration or expert reports in

ruling on BANA's summary judgment motion.[9]

## IV.    Summary Judgment Analysis

### A.    Law Applicable to Highland's Claims

Highland assumes that New York law applies because the LSTA states that it is governed by

New York law.  Highland also asserts that the Fifth Circuit recognized that New York law applies

to the parties' dispute.  BANA contends that the LSTA does not apply and therefore the provision

in the LSTA calling for the application of New York law is inapplicable as well.  BANA contends,

on the other hand, that Texas law applies to the parties' dispute and Highland's claims.  It

nevertheless maintains that it is entitled to judgment on Highland's claims under either New York

or Texas law.

While the Fifth Circuit recognized in its October 2012 Opinion that Highland's claims were

governed by New York, it did so without conducting a choice of law analysis and merely because

this court previously assumed that New York law applied based on the parties' apparent agreement

that such law applied.  Accordingly, the Fifth Circuit's prior application of New York law is not

dispositive.  The court nevertheless concludes that the choice of law provision in the LSTA

providing for application of New York law applies here.

---

[8] District courts have discretion to control their dockets by setting and enforcing adherence to reasonable deadlines. *S & W Enters., L.L.C. v. SouthTrust Bank of Ala., NA*, 315 F.3d 533, 536 (5th Cir. 2003); *see also Fahim v. Marriott Hotel Servs., Inc.*, 551 F.3d 344, 348 (5th Cir. 2008) (affirming the exercise of a district court's discretion to deny leave to amend, when the first and third factors weighed against the movant—emphasizing the first factor).

[9] In support of its summary judgment response, Highland also attaches and relies on the unsworn report of BANA's expert for the proposition that the Regency Loan is governed by the LSTA.  Because it is unsworn and it is not in a form admissible under Rule 56, the court will not consider this evidence.  As herein explained with regard to the parties' motions to exclude each other's expert testimony, BANA, unlike Highland, does not rely on the testimony or report of its expert in support of its summary judgment motion.

In support of its summary judgment motion, BANA came forward with evidence establishing that the two transactions alleged in Plaintiff's pleadings, the Oxbo and Cequel transactions, did not involve Highland as the buyer or seller. BANA therefore contends that the LSTA standard terms and conditions, and in particular paragraph 21 of the LSTA applicable to prior LSTA transactions, were not incorporated and do not apply to the Regency Loan transaction. Highland apparently acknowledges in its response brief that the Oxbow and Cequel transactions alleged in its pleadings do not support its position that the LSTA applies by default to the Regency Loan transaction based on the parties' prior trade confirmations. Highland nevertheless asserts that sometime after BANA moved for summary judgment, it located *other* prior trade confirmations executed by the parties that were governed by the LSTA standard terms and conditions for par/near par trade confirmations.[10] Highland therefore contends that the LSTA standard terms and conditions apply to the Regency Loan transaction pursuant to paragraph 21 of the LSTA.

Highland's evidence establishes that it and BANA were signatories to prior trade confirmations that were governed by the LSTA. Paragraph 21 of the LSTA provides:

> **Binding Effect**: By execution of a Confirmation incorporating by reference the Standard Terms and Conditions, each of Buyer and Seller agrees to be legally bound to any other transaction between them (whether entered into before, on or after the Trade Date) with respect to the assignment, purchase, sale and/or participation of commercial and/or bank par/near par loans, or any interest therein, upon reaching agreement to the terms thereof (whether by telephone, exchange of electronic messages or otherwise, directly or through their respective agents, and whether the subject of a confirmation), subject to all the other terms and conditions set forth in any confirmation relating to such transaction, or otherwise agreed. Each of Buyer and Seller further agrees that any such transaction shall be governed by and construed in accordance with the law of the State of New York, without regard to any conflicts

---

[10] In its reply brief, BANA did not object to Highland's evidence of these transactions on the grounds that they are inconsistent with or outside Plaintiff's pleadings or inadmissible for other reasons. The court therefore considers them.

of law provision that would require the application of the law of any other jurisdiction.

Pl.'s App. 421, ¶ 21.

Accordingly, pursuant to paragraph 21 of the LSTA and Highland's evidence of the parties' prior trades that were governed by the LSTA, the court determines that the LSTA and the New York choice of law provision contained in the LSTA applied by default to the Regency Loan transaction except to the extent BANA opted out of the LSTA or made the trade "subject to all the other terms and conditions set forth in any confirmation relating to such transaction." *Id.* While BANA contends that Texas law applies, it does not explain the basis for its contention in this regard or point to facts from which the court is able to conduct a choice of law analysis. Def.'s Mot. 13, n.2. Moreover, the court's conclusion that New York law applies would be the same even if it determined that the choice of law provision in the LSTA did not govern Plaintiff's contract claim. The summary judgment record indicates that BANA intended for New York law to apply to the Regency Loan trade because the draft agreements circulated by it in December 2009 call for application of New York law. *See* Pl.'s App. 344, ¶ 9. Accordingly, the court will apply New York substantive law in deciding BANA's summary judgment motion as to Plaintiff's contract claim.

**B.     Oral Contract Claim**

BANA contends that Highland's oral contract claim is barred by the statute of frauds. Alternatively, BANA contends that the evidence establishes that no binding contract was formed as a result of the December 3, 2009 telephone conversation between Maidman and Daugherty regarding the Regency Loan or the parties' subsequent communications and negotiations. BANA contends that the evidence establishes that there was no meeting of the minds or mutual assent necessary for the

formation of a binding contract under New York law.  For support, BANA relies on the declaration

of Maidman and various e-mail communications between the parties.[11]  BANA further asserts that

the uncontroverted objective evidence establishes that the parties, and in particular BANA, did not

manifest an intent to be bound absent consents and certain signed, executed written agreements.

BANA therefore contends that Highland's "contract by surprise theory" based on industry custom

fails and is not supported by New York law or the plain language of the LSTA.  Def.'s Reply 7-8

(citing and quoting *Tri-County Motors, Inc. v. American Suzuki Motor Corp*., 301 F. App'x 11, 13

(2d Cir. 2008) ("As to breach of contract, Tri-County's reliance on industry custom and practice is

misplaced because custom cannot create an intent to be bound.")).

Highland counters, based on paragraph 21 of the LSTA and industry custom, that the

December 3, 2009 telephone call resulted in a binding oral contract and trade as to the Regency Loan

because all "material" terms of the trade were agreed upon.  According to Highland, the material

terms of trade consist of the parties, subject matter of the trade, credit, amount, and price.  Pl.'s Resp.

31.  Based on industry custom, Highland contends that because BANA never expressly reserved the

right not to be bound absent a signed writing and did not opt out of the LSTA standard terms and

conditions during the December 3, 2009 telephone call when all materials or essential terms of the

trade were agreed upon, the Regency Loan trade was binding on the parties at the conclusion of that

telephone call.  Highland acknowledges that Maidman stated during the call and in a subsequent e-

mail that the trade was "subject to appropriate consents and documentation," but it contends that this

---

[11] When BANA filed its summary judgment motion, Maidman and Daugherty had not yet been deposed.  BANA employee Caroline Hubbell Yingling, another key witness, had also not been deposed.

statement was insufficient to expressly opt out of the LSTA standard terms or reserve nonstandard terms and negate the existence of a binding contract.

Highland's response to BANA's summary judgment focuses heavily on its contention that Maidman and other BANA persons who handled the Regency Loan trade were inexperienced and unfamiliar with industry practices and custom and the LSTA standard terms and forms. Highland nevertheless maintains that the parties' negotiations regarding the Regency Loan transaction should be viewed through the lense of industry practice and the manner in which similar trades are typically handled. Highland also contends that Daugherty's testimony is more credible because he has considerably more experience in the industry handling debt trades governed by the LSTA.[12] Highland also notes that Daugherty does not have an interest in the outcome of this case, as he is no longer employed by Highland and is currently involved in contentious employment related litigation against Highland. According to Highland, Daugherty's deposition testimony is sufficient to create a genuine dispute of material fact as to whether BANA manifested an objective intent to opt out of the LSTA standard terms and form documentation before or at the time of the Regency Loan trade on December 3, 2009.

### 1.    New York Law Applicable to Contract Claims

In its October 2012 Opinion, the Fifth Circuit summarized New York law applicable to contracts, including oral contracts, as follows:[13]

---

[12] Despite Highland's assertion in this regard, the court notes and clarifies that it does not assess or weigh the credibility of witnesses in ruling on a summary judgment motion, as it would be improper for the court to do so.

[13] As previously noted, the Fifth Circuit did not conduct a choice of law analysis but instead analyzed Highland's claims under New York law for the same reason that this court applied New York law: "[b]ecause the LSTA Standard Terms state that they are governed by New York law and both parties acknowledge that Highland's claims are governed by New York law[.]" *Highland Capital Mgmt., L.P. v. Bank of America, Nat'l Ass'n*, 698 F.3d 202, 206 n.2 (5th Cir. 2012) (quoting *Highland Capital Mgmt.*, 2011 WL 5428779, at *2).

An enforceable contract requires "a mutual intent to be bound." *Four Seasons Hotels Ltd. v. Vinnik*, 127 A.D.2d 310, 515 N.Y.S.2d 1, 5 (1987). If a contract is unambiguous, then a court may decide the parties' intent as a matter of law, but where the contract is ambiguous, or "cannot be interpreted without resort to extrinsic evidence," then the factfinder must determine the parties' intent. *Brighton Inv., Ltd. v. Har-ZVI*, 88 A.D.3d 1220, 932 N.Y.S.2d 214, 216 (2011). Courts use an objective test to determine whether the parties intended to enter into a contract, looking to "the manifestation of a party's intention rather than the actual or real intention." *Vinnik*, 515 N.Y.S.2d at 6 (quoting 21 N.Y. Jur. 2d, Contracts, § 29). In addition, even if a writing indicates that the parties left certain terms open for further negotiation, the parties are still bound by the contract if the matters left open were not deemed to be material by the parties. *Id.*

Oral contracts are also valid under New York law, *Winston v. Mediafare Entm't Corp.*, 777 F.2d 78, 80 (2d Cir. 1985), but if the parties do not intend to be bound by an oral contract until a writing is signed, then they are not bound until that time, *Powell v. Omnicom*, 497 F.3d 124, 129 (2d Cir. 2007); *see also R.G. Grp., Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 74 (2d Cir. 1984). With respect to oral contracts, whether a contracting party intends to be bound is a question of fact for the factfinder to resolve. *Consarc Corp. v. Marine Midland Bank, N.A.*, 996 F.2d 568, 576 (2d Cir. 1993). Courts generally consider four factors in determining whether parties intend to be bound absent a writing: "(1) whether there has been an express reservation of the right not to be bound in the absence of a writing; (2) whether there has been partial performance of the contract; (3) whether all of the terms of the alleged contract have been agreed upon; and (4) whether the agreement at issue is the type of contract that is usually committed to writing." *Powell*, 497 F.3d at 129. The circumstances indicating an intent to be bound "may be shown by 'oral testimony or by correspondence or other preliminary or partially complete writings.'" *Winston*, 777 F.2d at 81 (quoting Restatement (Second) of Contracts § 27 cmt. c (1981)).

*Highland Capital Mgmt., L.P. v. Bank of America, Nat'l Ass'n*, 698 F.3d 202, 206-07 (5th Cir. 2012)

(footnotes omitted). As explained by the court in *Vinnik*, in considering the parties' manifestations

of intent, disproportionate emphasis should not be placed "on any single act, phrase or other

expression but, instead, on the totality of these [factors], given the attendant circumstances, the

situation of the parties, and the objectives they were striving to attain." *Vinnik*, 127 A.D.2d at 317.

Based on the foregoing factors, the court concludes, for the reasons herein discussed, that Highland

has failed to raise a genuine dispute of material fact as to whether the parties intended to be bound

as of September 3, 2009, absent consents and a writing to memorialize the terms of the Regency Loan trade that were considered material.

### 2.   *Winston* Factors

#### a.   Express reservation

Highland disputes the detail to which Maidman explained during the December 3, 2009 telephone call that the Regency Loan trade would need to be subject to appropriate consents and documentation.  On this issue, Daugherty testified that he thought Maidman was taking "liberties" in his declaration regarding the detail to which the parties discussed what was meant by appropriate consents and documentation.  It is undisputed, however, that Maidman stated that the Regency Loan trade was subject to appropriate consents and documentation, and Daugherty acknowledged that the trade would be subject to borrower and lender consent.  Daugherty also acknowledged that Maidman "specifically mention[ed], 'We have our own docs.'" Pl.'s App. 191.  Daugherty, however, assumed that Maidman meant the standard LSTA documents and admitted that he was the one who kept referring to the LSTA, not Maidman.  *Id.*

Shortly after their telephone conversation, Maidman reiterated in an e-mail to Daugherty, "Pat, just to restate this [trade] is subject to appropriate consents and documentation." Def.'s App. 6.  At this time, Maidman and Daugherty did not realize that they each attributed different meaning to the phrase "subject to appropriate consents and documentation."  Later that same day, BANA's outside counsel David L. Eades ("Eades") e-mailed Carter Chism ("Chism") at Highland stating: "We've been retained by BoA in connection with this *proposed* loan trade. Can you give me a call at your convenience to discuss matters? Note that BoA does not plan to use Banc of America

Securities trading desk for this matter, *so its protocol may differ from similar trades you have done with the bank*." Pl.'s App. 326 (emphasis added).

Caroline Hubbell Yingling ("Yingling") of BANA was copied on Eade's e-mail to Chism. On December 7, 2009, in response to Chism's request to provide Highland with "confirms today," Yingling indicated: "As I think David Eades mentioned in his first email to you, *I don't think we will be doing a standard confirm for this particular assignment*. I hope to be able to send you all draft documentation for the assignment today or tomorrow." Def.'s App. 323 (emphasis added). In e-mails on December 4 and December 9, 2009, Yingling also explained to Chism *that borrower and agent consents and additional documentation, not included in the standard LSTA forms forwarded by Chism*, *would need to be obtained and executed*. In a December 4, 2009 e-mail to Chism, Yingling states: "Unfortunately, this [trade] confirm (and the incorporated LSTA Standard Terms) does not contain the necessary confidentiality provisions. . . . We'd like to begin sharing the information your institution might need about this loan. . . . I will check in with the Agent's counsel about obtaining the necessary documents." *Id.* 328. In her December 9, 2009 e-mail to Chism, Yingling explains:

> Attached please find *draft assignment documentation* for the Regency Hospitals loan. In the interest of time, these documents are being distributed to you simultaneously with our distribution to Bank of America and therefore *remain subject to further review and final approval*. Please let us know if you have any questions or concerns with these drafts.
>
> *As we mentioned before, pursuant to the terms of the Credit Agreement, the Borrower and Agent must consent to this assignment in the form of the agreement attached* entitled "Assignment Agreement." Once we have worked out any comments your institution or the Bank may have to these documents, we will circulate the one entitled "Assignment Agreement" to the Borrower and Agent for their consent. . . . We look forward to receiving any comments you may have.

*Id.* 332 (emphasis added).

**Memorandum Opinion and Order – Page 25**

Instead of executing the assignment agreement forwarded by Yingling, Chism forwarded to Yingling LSTA trade confirmation forms on December 11, 2009. *Id.* 287. Later that same day, in response to Chism's and Highland's request to use the standard LSTA trade confirmation forms for this deal, Yingling responded that BANA would agree to the request, but again indicated that the documentation previously forwarded to Chism would need to be executed *in addition* to the LSTA trade forms prepared by Chism so that Yingling could forward them to the Borrower and Agent for their consent and execution. She further states: "Please note that I cannot send this document [assignment agreement containing broad limitation of liability language] to the Borrower and Agent for their necessary consent until your institution [Highland] has agreed to the form of this document." *Id.* 359.

The draft assignment agreement documentation circulated by Yingling states that it may only be amended or modified by written agreement. *Id.* 338, ¶ 7; 348, ¶¶ 21.1, 21.8. The documentation also contains a merger clause, which states:

> This Agreement, and any assignments or other documents executed in connection with this Agreement, are intended by the parties as the final expression of their agreement and, therefore, incorporate all negotiations of the parties hereto and are the entire agreement of the parties hereto. The parties hereto acknowledge that they are relying on no written or oral agreement, representation, warranty or understanding of any kind.

*Id.* 348, ¶ 21.6. Merger provisions such as this are considered to be "persuasive evidence that the parties did not intend to be bound prior to the execution of a written agreement." *Ciaramella v. Reader's Digest Ass'n, Inc.*, 131 F.3d 320, 324 (2nd Cir. 1997). In addition, this same agreement states: "This Agreement shall be valid and binding when executed by the Assignee and the original or facsimile thereof is received and accepted by the Assignor." *Id.* ¶ 21.3. It also indicates that it will

not be effective until certain conditions precedent occur, including receipt of the purchase price, endorsed loan documents, and each party's receipt of a fully executed agreement. *Id.* 343, ¶¶ 5-5.5. On December 11, 2009, Yingling followed up regarding the status of the previously forwarded assignment agreements. *Id.* 359. These assignment agreements were never ultimately finalized and executed by the parties because BANA was unwilling to delete the indemnity provision in paragraph 12.1. *Id.* 393.[14]

On December 15, 2009, Yingling withdrew the trade confirmations previously signed by BANA because Chism appeared to be drafting new trade confirmations that replaced those previously circulated. *Id.* 357. Chism confirmed the signature withdrawal as to these confirmations. *Id.* On December 18, 2009, Chism circulated revised confirmations. Yingling responded by proposing the following revision to the Trade Specific Terms section of each trade confirmation: "Buyer acknowledges that (i) Trade is subject to consent by Agent and Borrower pursuant to terms of Credit Agreement and (ii) Seller undertakes no liability or responsibility to Buyer for obtaining such consent." *Id.* 356. Jason Green ("Green") on behalf of Highland responded to Yingling's proposed revision stating: "As previously discussed we will adhere to [LSTA] Standard Terms and Conditions. We are fine with you adding the following language per your request: 'Trade is subject to consent by Agent and Borrower pursuant to terms of Credit Agreement.' However, we will not support any further revisions." *Id.* 397-98.

---

[14] The e-mail communication in which this discussion took place is included in Plaintiff's Exhibit AA. The appendix page 393 is obscured by what appears to be an inadvertently placed additional and different appendix page of "App. 082." This e-mail and several other documents included in Exhibit AA include these ghost appendix page designations that cover the intended appendix pages that appear in the table of contents of Plaintiff's appendix. The court is therefore uncertain whether its citations to these pages is accurate.

In a December 21, 2009 e-mail, Yingling explained to Green and Chism that BANA was "unwilling to take on any liability for consents and will not execute these confirmations without such language." *Id.* 397. Green responded later that afternoon: "As previously discussed we will adhere to [LSTA] Standard Term[s] and Conditions." *Id.* 396-97. Negotiations deteriorated after this point, although the parties continued until June 2010 to exchange e-mails regarding the proposed terms of the trade. Def.'s App. 76-77; Pl.'s App. 388-94.

In the end, Highland insisted on using LSTA documents and standard LSTA terms and was unwilling to settle the trade with the indemnity and waiver of liability language in paragraph 12 of the draft assignment agreement and BANA's December 18, 2009 proposed revisions to the trade confirmation documents. BANA, on the other hand, was unwilling to use LSTA trade confirmation documents without the protection of the indemnity and waiver of liability language in paragraph 12 of the draft assignment agreement or its December 18, 2009 proposed revisions to the trade confirmation documents.

Based on the foregoing, the court concludes that BANA, through its conduct and the language in its communications with Highland and the draft agreements circulated, expressly and impliedly reserved the right not to be bound to the Regency Loan trade prior to obtaining borrower and agent consents and the execution of documentation that contained terms that were different from, and in addition to, those typically used in conjunction with the LSTA. While the parties initially were operating under the mistaken assumption that "subject to appropriate consents and documentation" meant different things, the language in BANA's subsequent correspondence and draft agreements communicated an intent not to be bound absent borrower and agent consents and the execution of documentation different from and in addition to that typically used in conjunction

with the LSTA.  *See Winston*, 777 F.2d at 81-82 ("Although neither party expressly reserved the right

not to be bound prior to the execution of a document, language in the correspondence does reveal

such an intent."); *CAC Grp. Inc. v. Maxim Grp. LLC*, No. 12-4381-CV, 2013 WL 1831672, at *4

(2d Cir. May 2, 2013) (unpublished) (quoting *Winston*, 777 F.2d at 81); *Lindner v. American Express

Corp.*, No. 06-CIV-3834(JGK), 2007 WL 1623119, at *6 (S.D.N.Y. June 5, 2007) ("Although this

factor is phrased in terms of 'express' reservations, courts   including the court in *Winston*   also

analyze whether the particular facts and circumstances of the case   such as the nature of the

negotiations or the language of any draft agreements   demonstrate an implied reservation of the

right not to be bound until the execution of a written agreement.").

The issue therefore is what role, if any, does industry custom play here in analyzing the first

*Winston* factor.  BANA and Highland both acknowledge that a party to a trade can opt out of the

LSTA standard terms and conditions to avoid being bound absent a signed writing, but they disagree

as to when and how this must be done to be effective.  As previously noted, Highland contends,

based on industry custom, that BANA was required to *expressly* opt out and reserve any nonstandard

terms no later than December 3, 2009, when it contends all material or essential terms of the trade

were agreed upon.  Thus, according to Highland, it was not enough for BANA to impliedly reserve

the right not to be bound by the LSTA standard terms during the December 3, 2009 telephone call

or in the parties' subsequent communications and negotiations.

Highland's argument in this regard, however, is based solely on the inadmissible expert

report of Ms. Taylor.  *See* Pl.'s Resp. 22 (citing Pl.'s App. 18).  Accordingly, there is no admissible

summary judgment evidence to support this contention by Highland.  Moreover, as noted by BANA,

nothing in the LSTA requires a party to expressly opt out or reserve nonstandard terms in any

particular form or manner.  Further, contrary to Highland's assertion, the plain language of paragraph 21 of the LSTA does not state that a binding agreement exists upon agreement to "material terms"; rather, it states that an agreement is "subject to *all the other terms and conditions set forth in any confirmation relating to such transaction, or otherwise agreed*.  Pl.'s App. 421, ¶ 21 (emphasis added).

Daugherty's testimony also severely undermines Highland's argument that the parties had a binding agreement as of December 3, 2009, and that the parties' negotiations regarding the Regency Loan should be analyzed through the lense of industry practice or custom.  Specifically, Daugherty testified that he was initially approached by Patrick Hurst ("Hurst") in November 2009, regarding the Regency Loan.  Hurst was a consultant with Houlihan Lokey, Inc. ("Houlihan") and was acting as an intermediary for BANA.  After agreeing on the price and amount, Daugherty said to Hurst "Done . . . we're done [on this trade.]" *Id.* 164.  According to Daugherty, this was the way in which parties in the industry normally consummated a trade and indicated that they had reached an agreement regarding the trade.  *Id.* 157-58, 159A.  Rather than confirming that they were "done," Hurst, much to Daugherty's surprise, responded in an e-mail saying that he had to check with his manager.  *Id.* 164  ("something happened, and Patrick comes back.  He goes, 'Okay.  Now he's going to go check with his boss, his manager." *And I'm like, 'Oh, God*.'") (emphasis added).  Hurst then advised, "B of A okay," but BANA committee approval was required.  *Id.* 176.  As a result of these communications, Daugherty "actually thought the trade was just going to disappear," and that Hurst or someone at BANA was not serious about settling the trade but instead "was just trying to price out his book."  *Id.* 165, 167.

On December 2, 2009, Maidman e-mailed Ann Gallagher, the head of BANA's SAG, regarding the "proposed sale" of the Regency Loan to Highland.  Pl.'s Resp. 10-11.; Pl.'s App. 320. Maidman requested Gallagher to "check assignment language" in the Regency Loan documents because he believed "we will need consent of both the agent and the borrower." Pl.'s Resp. 11; Pl.'s App. 320.  On December 3, 2009, Maidman informed Daugherty during a telephone call that he had obtained SAG committee approval for a price of 93.5.  Pl.'s Resp. 11; Pl.'s App. 229.  Daugherty therefore believed they were "done" with the trade and indicated his belief in this regard by stating they were "done." *Id*. 165.  Instead of acknowledging that they were "done," Maidman clarified that the trade was "subject to [consents and] documentation."  Daugherty responded "Sure. Fine. Subject you know, we're done, subject to documentation." *Id*. 165.  Based on this exchange, Daugherty believed that they had a trade; however, Daugherty told a different story when he acknowledged in his deposition: "He [Maidman]     basically said, 'We don't have a trade.' He didn't do it initially. He did it when     he said, 'Subject to documentation." *Id*. 166.

Daugherty also candidly acknowledged in his deposition that Maidman's unwillingness to say they were "done" with the trade was "cause for concern":

> I could never get him [Maidman] to say we were done.  I remember that, being very frustrated.  He would never say he was done.  And it was, you know, *cause for concern because obviously I wanted to do this trade, and I could never get him to say we were done.*

*Id.* (emphasis added).  Because the trade was expressly subject to obtaining consents, Daugherty also testified that he "didn't think it was a guaranteed deal." *Id.* 178.  As previously noted, Daugherty testified that Maidman did not mention LSTA during their December 3, 2009 telephone call, but "[h]e did specifically mention, 'We have our own docs.' I'm the one that kept saying LSTA." *Id.* 191.  Daugherty, however, did not think anything of it at the time because they were "still working

on the nuances of the trade." *Id.* He was not certain whether it was discussed on December 3, 2009, or some later point in time, but Daugherty acknowledged that Maidman made the point that there would be no trade absent a final signed agreement. *Id.* 189.

Regarding documentation, Daugherty testified that it became apparent sometime after December 3, 2009, that Maidman's reference to documentation did not mean LSTA form documents. *Id.* 166-67. Daugherty learned from people within his organization there was a "problem" in that BANA "didn't want to trade on LSTA docs." *Id.* 190A. Daugherty therefore telephoned Maidman and asked why he did not want to trade on LSTA documents, and Maidman responded: "I'm not going to trade on LSTA docs. We have our own docs." *Id.* Daugherty further testified that during one telephone call in December, Maidman and BANA's attorney were threatening him with litigation and he was similarly threatening them. *Id.* 181. According to Daugherty, every time the topic of documentation came up, Maidman would get his lawyer on the telephone, and "We argued about this point to the bitter end." *Id.* 184-184A.

More importantly, Daugherty's testimony establishes that he was aware as early as November 2009 that the Regency Loan trade was not a typical trade. *Id.* 155-B, 165, 176, 182. Daugherty described his communications and negotiations with Hurst and Maidman regarding the Regency Loan as "very atypical" although "not at all atypical when you're dealing with a knucklehead that has his own portfolio . . . instead of a guy on a trading desk." *Id.* 165. According to Daugherty, the manner in which BANA handled the trade was "terrible trading etiquette, terrible, *but not uncommon when you're going to a guy who doesn't trade*." *Id.* 182 (emphasis added). Daugherty recognized that Maidman was "not a trader. He's a line guy, you know, maybe even a restructuring guy." *Id.* Although Daugherty thought it was "terrible trading etiquette and very annoying," he testified that

he "*had to tolerate it because [he] knew [he] wasn't going through the standard    the standard process*, or whatever, of trading with a trading desk."[15]  *Id.* (emphasis added).

Thus, while it is clear from the evidence that Highland would have liked the trade to have been conducted in the customary manner, using LSTA form documents and standard terms, Daugherty's testimony establishes that Highland was aware early on that the proposed Regency Loan trade was not going to be handled in the customary manner because BANA's representatives for this particular transaction were not "traders" and therefore were not accustomed to doing business in that manner.  BANA also made clear in its communications with Highland that it wanted to use its own documentation in lieu of or in addition to the LSTA forms. Further, the assignment documentation circulated by BANA in conjunction with the LSTA trade confirmations contained indemnity and limitation of liability language that BANA deemed material in the event it was unable to obtain borrower consent to the trade.  As discussed, other language in the assignment documentation reflected an intent not to be bound absent execution of such documentation by both parties. Accordingly, based on all of the foregoing evidence, the court concludes that the first *Winston* factor weighs in favor of BANA.

### b.    Partial performance

Neither party devotes much attention or briefing to this factor.  BANA contends that "the alleged contract has never been performed even in part as BANA has remained steadfast that no deal was reached."  Def.'s Mot. 19.  Highland, on the other hand, maintains that the parties partially performed the Regency Loan contract by executing "LSTA confirmations and other documents in

---

[15] Daugherty's testimony in this regard makes Ms. Taylor's expert reports and opinions, regarding industry standards or practices applicable to typical trades, essentially irrelevant because, according to Daugherty, the Regency Loan trade and negotiations were anything but typical.  As a result, Ms. Taylor's opinions as to what industry standards or practices generally apply to par/near par trades are quite beside the point.

an attempt to finalize the transaction." Pl.'s Resp. 31 (citing Pl.'s App. 373-88). The evidence cited by Highland includes the contentious e-mails exchanged by the parties in 2010 and does not support its argument that the parties partially performed the Regency Loan contract by executing "LSTA confirmations and other documents in an attempt to finalize the transaction." *Id.*

Moreover, as previously discussed, the evidence establishes that the confirmations initially executed were withdrawn, and there is no indication or proof that the assignment documentation was ever executed. Daugherty also testified that no cash was ever tendered for the purchase. Pl.'s App. 199A. Even assuming that the parties' attempt at negotiating the various documentation and agreements constitutes partial performance, the language in these same agreements establishes that the parties did not intend to be bound until a final contract was signed. The court therefore concludes that evidence of the parties' intent in this regard outweighs any purported partial performance. *See Arcadian Phosphates, Inc. v. Arcadian Corp.*, 884 F.2d 69, 72-73 (2d Cir. 1989) (concluding that summary judgment on the plaintiff's contract claim was proper even though there was "considerable partial performance" because language in a memorandum showed that parties did not intend to be bound until final contract was signed).

### c.    Matters left to negotiate

BANA contends that this factor weighs in its favor because, even indulging all doubts in favor of Highland, the parties left multiple terms open to further negotiation following the December 3, 2009 telephone call such as the specific terms of the documentation itself and the Highland funds to which the Regency Loan would be allocated. Def.'s Reply 10. In its response brief, Highland notes that the existence of open terms is a factor in determining whether a Type II preliminary agreement has been formed. Highland appears to contend that this factor weighs in its favor because

agreement as to all material terms of the trade were reached.  Pl.'s Resp. 31.  BANA counters that

Highland cites no legal authority to support its contention that the material terms of a trade consist

of the parties, subject matter of the trade, credit, amount, and price.  BANA further asserts that

Highland's contention that the parties agreed upon all material terms of the Regency Loan trade is

based entirely on the inadmissible expert report of Ms. Taylor.

The Second Circuit's analysis in *Winston* as to this factor is instructive here:

> We turn to a consideration of the third factor, whether there was "literally
> nothing left to negotiate". *R.G. Group*, 751 F.2d at 76. The district court found that
> all changes made in the agreement after June 20 related only to language and were
> not "of any substance". Although the district court may have correctly assessed the
> parties' characterizations of the relative importance of the later changes, the facts that
> such changes were minor and that oral agreement was actually reached on all of the
> remaining terms *does not necessarily lead to the conclusion that the parties were
> bound prior to these modifications*. Nor does it indicate an intent to give up the right
> to be bound only upon execution of a formal document. As we noted in *R.G. Group*,
> "[*t*]*he actual drafting of a written instrument will frequently reveal points of
> disagreement, ambiguity, or omission which must be worked out prior to execution.
> Details that are unnoticed or passed by in oral discussion will be pinned down when
> the understanding is reduced to writing*." 751 F.2d at 75. That these "unnoticed" or
> "passed by" points of disagreement may in the long view be fairly characterized as
> minor or technical does not mean that a binding contract was formed prior to the time
> that they were finally worked out.
>
> *Here, the drafting process revealed several points of disagreement*. After the
> May 9 meeting it was agreed that Kokot would prepare the "first draft". When
> Marcus received that document he pointed out four problem areas. After those
> disagreements were worked out Marcus sent a "second draft" to Kokot on June 28,
> adding several additional language changes. Kokot could have assented to Marcus'
> proposed contract, but he chose not to, and instead, sent back to Marcus a new
> document, the "third draft", with more suggested changes. The problems created by
> these changes were worked out orally sometime between June 28 and July 26. By that
> time, however, the settlement agreement was no longer acceptable to the defendants.
>
> *Where, as here, counsel insist on continually redrafting the specific terms of
> a proposed agreement, the changes made must be deemed important enough to the
> parties to have delayed final execution and consummation of the agreement*. Parties
> that wish to be bound only upon execution of a formal document agree to negotiate
> in that manner because they wish to create a writing that is satisfactory to both sides

in every respect. It is not for the court to determine retrospectively that at some point in the evolution of a formal document that the changes being discussed became so "minor" or "technical" that the contract was binding despite the parties' unwillingness to have it executed and delivered. For the court to do so would deprive the parties of their right to enter into only the exact contract they desired.

*Winston*, 777 F.2d at 82-83 (emphasis added).  Based on its reasoning in *Winston*, the Second Circuit stated in *Powell*: "We have held that even 'minor' or 'technical' changes arising from negotiations over the written language of an agreement can weigh against a conclusion that the parties intended to be bound absent a formal writing."  *Powell*, 497 F.3d at 130 (citing and quoting *Winston*, 777 F.2d at 82-83).  "Such changes are relevant, however, only if they show that there were points remaining to be negotiated such that the parties would not wish to be bound until they synthesized a writing "satisfactory to both sides in every respect." *Powell*, 497 F.3d at 130 ( "A . . . factor is whether there was literally nothing left to negotiate or settle, so that all that remained to be done was to sign what had already been fully agreed to.") (quoting *R.G. Grp., Inc.*, 751 at 76).

Applying the same reasoning to the evidence in this case, the court concludes that settling and finalizing the Regency Loan trade involved more than simply signing documentation that contained the basic terms agreed to during the December 3, 2009 telephone call.  Executing the documentation as to the Regency Loan trade was thus more than purely ministerial.  Even assuming, as Highland contends, that the parties reached agreement regarding the basic terms of the trade during the December 3, 2009 telephone call, they did not discuss the details of the trade or what Daugherty referred to as the "nuances" of the transaction, and it was only later discovered during the drafting and negotiating process that the parties were unable to agree regarding the type of documents that would be used    LSTA standard form documents, BANA's documents, or both

or the terms to be included in the documents despite numerous e-mails, telephone calls, and proposed revisions to agreements previously circulated.

Further, although the issue of consents was touched upon during the December 3, 2009 telephone call, a key issue left open to negotiation and discussion was whether BANA could be held liable in the event the borrower and agent did not consent to the trade in form negotiated by the parties. It was this issue, which both parties considered to be material, that ultimately caused their negotiations and the purported deal as to the Regency Loan to unravel. This factor therefore weighs in favor of BANA.

### d.    Whether agreement is usually committed to writing

BANA does not appear to address this factor. Highland, on the other hand, maintains that loan trades are not the type of contract usually committed to writing. Highland's contention in this regard, however, is based on Ms. Taylor's inadmissible expert report. Pl.'s Resp. 32. The only admissible evidence before the court as to this issue is Daugherty's testimony that ultimately in these types of transactions, there is a "trade confirm" that is signed by the parties. Pl.'s App. 157. The LSTA similarly contemplates that documentation will be executed. *See* Pl.'s App. 408, ¶ 1; 414, ¶¶ 10-11. Moreover, as already discussed, Daugherty acknowledged that this was not a typical trade in the ordinary sense. Thus, absent any evidence or legal authority to the contrary, the court concludes that this factor weighs in favor of BANA.

Accordingly, based on the four-factor test in *Winston* and the *totality of the evidence*, the court concludes that no binding agreement resulted from the December 3, 2009 telephone call or the parties' subsequent negotiations that ultimately fell apart. While it is clear from Daugherty's testimony and evidence of the parties' communications that Highland desperately wanted there to

**Memorandum Opinion and Order – Page 37**

be a deal as to the Regency Loan, and Daugherty and Highland were admittedly frustrated and annoyed with the nontraditional manner in which Maidman and BANA wanted to handle the trade, the evidence establishes that BANA manifested an objective intent each step along the way not to be bound absent consents by the parties and the execution of certain signed agreements containing terms that varied from the standard LSTA form documentation.

The evidence, viewed in the light most favorable to Highland, does not support Highland's version of events and is insufficient to raise a genuine dispute of material fact. The court's conclusion in this regard is based on all of the evidence in the record rather than the "sound-bites" on which Highland focuses, which tend to mischaracterize and take out of context the evidence and witness testimony. No doubt, Daugherty's deposition testimony is critical to the court's analysis; however, when it is viewed in its entirety together with the other evidence, most of which was submitted by Highland, his deposition testimony strongly negates the existence of a binding contract or trade. Having determined that no binding contract exists, the court need not address the parties' argument regarding the applicability of the statute of frauds.

### C.    Preliminary Contract Claim

In its Second Amended Complaint, Highland asserts, in the alternative, a preliminary contract claim based on BANA's alleged failure to negotiate the final contractual documents in good faith. According to Highland's pleadings: "BofA materially breached its agreement to sell the Regency Loan by demanding additional conditions to its performance that were not a part of the binding agreement or standard industry terms. Alternatively, BofA materially breached the preliminary agreement by failing to negotiate a settlement of the transaction in good faith." Pl.'s Compl. 12. Because the good faith element applies only to Type II preliminary agreements, BANA contends that

Highland has only asserted a Type II preliminary contract claim, which does not commit the parties to the ultimate contractual obligation but instead merely obligates them to negotiate in good faith in an attempt to reach the objective within an agreed upon framework. *See* Pl.'s Resp. 30-32; Def.'s Mot. 22 and n.N.[16] Highland appears to acknowledge in its summary judgment response that it has only pleaded a Type II preliminary agreement, and the court concludes, based on Highland's pleadings that it has only asserted a Type II preliminary agreement.

The analysis in *Teachers Insurance and Annuity Association of America v. Tribune Company*, 670 F. Supp. 491 (S.D.N.Y. 1987), is frequently followed by federal courts in the Second Circuit in determining whether parties have reached a preliminary agreement that is enforceable even when the final documents are never executed. The court in *Tribune* classified preliminary agreements as Type I and Type II agreements. In Type I agreements, the parties have reached complete agreement, and all that remains is to commit the agreement to writing to satisfy formalities. In Type II agreements, open terms exist, even major ones, but the parties have agreed on certain important terms and they agree to negotiate in good faith to work out the remaining open terms. *Id.* at 498; *Arcadian*, 884 F.2d at 72. "This [good faith] obligation does not guarantee that the final contract will be concluded if both parties comport with their obligation, as good faith differences in the negotiation of the open issues may prevent a reaching of final contract." *Tribune*, 670 F. Supp. at 498. In determining whether a preliminary agreement is a binding Type II agreement, the court considers: "(1) the language of the agreement; (2) the context of the negotiations; (3) the existence of open terms; (4) partial performance; and (5) the necessity of putting the agreement in final form,

---

[16] BANA's footnote "N" is the fourth footnote in its summary judgment brief. The reference to "N" appears to be a typographical error.

as indicated by the customary form of such transactions." *Arcadian*, 884 F.2d at 72 (citation omitted). Of these factors, the first is the most important. *Id.*

Based on the foregoing factors, which are substantially identical to those already considered by the court, Highland contends that there was a Type II preliminary agreement that obligated BANA to negotiate in good faith the terms that remained open in the Regency Loan trade such as the type of documentation to be used and the need to obtain consents. Highland contends that BANA breached its obligation to negotiate in good faith because:

> [A]s of December 18th, BANA already knew that the Borrower would likely not consent. (Exhibit N at 157:7-10 at App. 269.) Had BANA and Highland previously agreed to the disputed terms, then on December 18th BANA would have simply told Highland that the Borrower had failed to consent and therefore the trade was off and BANA was not liable to close as a participation or other economic equivalent. Instead, BANA made its first documented and explicit request for provisions in the LSTA Confirmations that purported to make any settlement of the trade expressly contingent on borrower consent and waiving BANA's liability for the Borrower's failure to consent. (Exhibit N at 153:11-24 at App. 267.) BANA offers no explanation for its tardy and disingenuous attempt to make the transaction contingent on an event it knew would not occur.

Pl.'s Resp. 32. According to Highland, Maidman executed an LSTA Confirmation on the Regency Trade "that BANA later tried to withdraw. In fact, and very tellingly, BANA only tried to squelch the deal and avoid the economic consequences of closing the trade as something other than an assignment after it learned that the Regency loan likely would pay off at par." Pl.'s Resp. 4

Highland further asserts that the LSTA standard terms required BANA as the seller to obtain any necessary consents. Highland contends that "the Regency loan provided that consent to an assignment could not be 'unreasonably withheld,'" and "BANA offered to use 'reasonable and usual' efforts to obtain the Borrower's consent." Pl.'s Resp. 33 (citing Pl.'s App. 217, 373-86). Based on the testimony of Maidman and Yingling, Highland contends that BANA ***"did nothing at all*** to obtain

the Borrower's consent." *Id.* (emphasis in original).  Highland further asserts that, although BANA did nothing to obtain the necessary consents, it used the lack of consent to avoid the trade.  In addition, Highland contends that BANA learned during the parties' negotiations that the borrower had entered a letter of intent to sell itself to Select Medical Holdings, which ultimately acquired the borrower a few months later.  Highland contends that almost immediately after learning that the borrower had entered the letter of intent, BANA requested for the first time the nonstandard waiver of liability language, which according to Highland, was "the death knell of the deal."  *Id.*

BANA maintains that the uncontroverted evidence demonstrates that it diligently attempted to reach a mutually acceptable agreement for approximately six months following the December 3, 2009 telephone call, that it enlisted transactional attorneys, drafted confidentiality agreements, proposed draft assignment agreements, proposed draft loan sale agreements, and participated in numerous e-mail exchanges and telephone conferences to determine whether a deal could be made as to the Regency Loan.  Def.'s Reply 10.  BANA therefore contends that it is entitled to summary judgment on Highland's Type II preliminary contract claim.

As a preliminary matter, the court notes that it is unclear what Highland refers to when it states: "*the Regency loan* provided that consent to an assignment could not be 'unreasonably withheld.'" "  Pl.'s Resp. 33 (citing Pl.'s App. 217, 373-86).  If Highland is referring to a term in a specific agreement, it is not clear from its citations to the record to which agreement it is referring.[17]  For the reasons already discussed at length, the court concludes that BANA expressly

---

[17] Highland's citation to page 217 of its appendix includes an except from Yingling's deposition testimony in which she confirms that an unidentified document states that consent will not be unreasonably withheld.  The other evidence that Highland cites to consists of 13 pages of e-mails. In most of these e-mails, the parties are disputing whether and how certain terms were previously discussed.  Of these e-mails, the court was only able to find one in which Yingling states in passing with regard to the assignment documentation that consents will not be unreasonably withheld.  Pl.'s App. 385. There does not appear, however, to be any such provision in the assignment documentation and Highland does not

or impliedly expressed an intent not to be bound absent future formal documentation and its unwillingness to say the trade was "done" should have alerted Highland early on that BANA did not intend to be bound at that time. *See Arcadian*, 884 F.2d at 72-73.  Accordingly, the court "need look no further than the first factor" to determine whether there was a Type II preliminary agreement. *Id.* Moreover, Highland's contention that BANA breached its obligation to negotiate in good faith by (1) not undertaking efforts to obtain borrower and agent consents; and (2) attempting to change the parties' agreement on December 18, 2009, by inserting nonstandard waiver of liability language after learning that the borrow had entered a letter of intent, misses the mark and is not supported by the record.

Evidence submitted by Highland establishes that Maidman and Yingling did not learn about the letter of intent until December 15, 2009, or December 16, 2009.  While it is true that Yingling proposed a revision on December 18, 2009, to the trade confirmations prepared by Highland that would protect BANA from liability if it did not obtain borrower and agent consents, draft assignment documentation containing indemnity and waiver language much broader in scope was circulated by Yingling prior to December 15, 2009.  Pl.'s App. 332, 338, 344-45.  Highland attempts to downplay the significance of this language in the assignment documentation by pointing to Yingling's deposition testimony that she did not consider the language in paragraph 12 to an indemnity provision.  Regardless of Yingling's characterization, the assignment documentation speaks for itself.

Moreover, it is undisputed that the Regency Loan trade was always subject to borrower and agent consents.  Thus, neither the broad waiver and indemnity language in the assignment

---

direct the court's attention to any.

documentation nor the subsequent more narrow December 18, 2009 proposed limitation of liability language pertaining specifically to consents is inconsistent with the issue of whether borrower and agent consents were contemplated and necessary.   The language proposed by BANA and the standard terms insisted on by Highland merely attempted to place the liability as to those consents upon the other party.

Additionally, in a December 9, 2009 e-mail, Yingling explained that borrower and agent consents would not be sought *until after* the parties worked out any concerns and changes to the assignment documentation. On December 11, 2009, Yingling reiterated that Highland needed to agree to the assignment agreements before she could seek the consent of the borrower and agent. *Id.* 359.  Highland, however, never agreed to the assignment agreements because of the indemnity and waiver language included in them.  Thus, under the circumstances, Maidman's and Yingling's failure to undertake efforts to obtain borrower and agent consents prior to Highland agreeing to the terms of the assignment agreements is of no moment.  Yingling testified similarly in her deposition, based on her December 9, 2009 e-mail, that consents would not be sought until Highland agreed to the terms of the assignment documents.  *Id.* 274.  The evidence also establishes that, contrary to Highland's assertion, Maidman did not learn that the Regency Loan would pay off at 100 percent par *until months after December 18, 2009.*  As a result, his knowledge in this regard could not form the basis for his allegedly wanting to avoid the trade in December 2009.

Further, contrary to Highland's assertion, BANA did not try to withdraw the confirmations it signed, it did withdraw the confirmations, and Highland confirmed the withdrawal *before December 15, 2009, the earliest date when Maidman and Yingling first learned about the letter of intent.*  Thus, Highland's theory that BANA attempted to actively deceive Highland and avoid the

**Memorandum Opinion and Order – Page 43**

trade by proposing waiver or limitation of liability language to the parties' agreement for the first time on December 18, 2009, mischaracterizes the evidence in that it fails to account for substantially broader waiver or limitation of liability language in the assignment documentation circulated before Maidman and Yingling learned about the letter of intent.

Highland's contention regarding the trade being closed as a participation or other economic equivalent is likewise unavailing. Highland's contention in this regard is based on a theme that is repeated throughout its response to BANA's summary judgment. Highland contends, based on Ms. Taylor's expert report and industry custom, the LSTA, and Daugherty's deposition testimony: "[W]hen Mr. Daugherty and Mr. Maidman agreed to the Regency Trade 'subject to agent and borrower consents,' they agreed to close the transaction as either an assignment, a participation, or other economic equivalent. This critical fact is fatal to BANA's Motion." Pl.'s Resp. 2, 4, 7, 8, 17, 26, 27, 29, 32. Highland therefore contends that if the trade could not be settled as an assignment, BANA was required to settle it as a participation or other economic equivalent.

Highland's contention that the parties "agreed" to close the transaction as either an assignment, a participation, or other economic equivalent refers to paragraph one of the LSTA, which states:

> If Buyer and Seller are unable to effect settlement of the Transaction as specified in the Confirmation, a valid and binding obligation to settle the trade nevertheless continues to exist between Buyer and Seller. If a Transaction that is to be settled by assignment cannot be settled on such basis, such Transaction shall be settled as a participation; provided that if settlement by participation cannot be effect, the Transaction shall be settled on the basis of a mutually equivalent of the agreed-upon trade; provided, *further*, that if "Assignment Only" is elected in the "Form of Purchase" section of the Confirmation (an "Assignment Only Election") and the Transaction cannot be settled on such basis, Buyer and Seller shall not settle the Transaction as a participation but shall instead settle on the basis of a mutually agreeable alternative structure or other arrangement that affords Buyer and Seller the economic equivalent of the agreed-upon trade.

Memorandum Opinion and Order – Page 44

Pl.'s App. 408 (emphasis in original).  Here, it is undisputed that the first trade confirmation executed by BANA was withdrawn and it does not appear that any subsequent confirmations were ever executed.  In all of the confirmations circulated, however, "Assignment Only" is elected in the "Form of Purchase" section of the confirmations.  Thus, according to paragraph one of the LSTA, if the parties are unable to settle the Regency Loan trade as an assignment, "Buyer and Seller *shall not settle the Transaction as a participation but shall instead settle on the basis of a mutually agreeable alternative structure or other arrangement that affords Buyer and Seller the economic equivalent of the agreed-upon trade*." *Id.* (emphasis added).  Accordingly, BANA was not required under the LSTA to settle the Regency Loan trade as a participation.  Moreover, although Daugherty testified that he believed the Regency Loan trade could be closed as a participation even without borrower and agent consents, he admitted that trades are rarely settled as participations, and he rejected counsel's suggestion that it was industry practice to do so.  Pl.'s App. 180 ("I don't know about standard in the industry because a lot of people as the standard wouldn't take names on participation, and some banks wouldn't trade on participation. Some street firms will not do participations. . . . In fact, most won't.").

The issue therefore is whether BANA failed to negotiation in good faith by not closing the trade "on the basis of a mutually agreeable alternative structure or other arrangement that affords Buyer and Seller the economic equivalent of the agreed-upon trade." *Id.* 408.  Highland asserts that BANA was required to settle in this manner even if consents were not obtained, and that BANA's attempt on December 18, 2009, to add nonstandard waiver language, in the event consents were not obtained, was disingenuous because it knew by this time that the borrower had entered a letter of intent to sell itself to another entity and would not consent to the sale to Highland.  As previously

discussed, Highland also maintains that BANA proposed the waiver language on December 18, 2009, to avoid the economic consequences of closing the trade as an economic equivalent because Maidman learned that the Regency Loan would likely pay off at par.

For the reasons already explained, Highland's argument as to the import of the waiver or limitation of liability language proposed by BANA on December 18, 2009, is undercut by the previously circulated draft assignment documents containing much broader language that would have protected BANA from any liability resulting from the Regency Loan trade.  In addition, Maidman testified that BANA proposed the waiver language on December 18, 2009, because it was being threatened with litigation. Maidman's testimony in this regard is consistent with Daugherty's testimony that both parties threatened litigation when they could not agree on the type of documents to be used.  Moreover, there is no evidence that Maidman knew as of December 18, 2009, that the Regency Loan would pay off at par if purchased by someone other than Highland.  Thus, when viewed in conjunction with the other evidence, Highland's contention, based on the timing of the letter of intent, that BANA proposed the waiver language on December 18, 2009, for improper reasons to avoid the deal is insufficient to create a genuine dispute of material fact as to whether BANA acted in good faith in negotiating.[18]

---

[18] In arguing that BANA's reasons for requesting the proposed language on December 18, 2009, were improper, Highland appears to contradict itself:

> Mr. Maidman, a novice trader who was not even aware of the LSTA or the LSTA Standard Terms at the time, did not objectively manifest an intent that the Regency Trade would not be governed by the LSTA Standard Terms, including that the deal would not close as a participation or other economic equivalent if agent and borrower consent were not obtained (nor would he have known to do so). Mr. Maidman then executed an LSTA Confirmation on the Regency Trade that BANA later tried to withdraw. In fact, and very tellingly, BANA only tried to squelch the deal and avoid the economic consequences of closing the trade as something other than an assignment after it learned that the Regency loan likely would pay off at par.

Pl.'s Resp. 4. Highland contradicts itself by arguing, on one hand, that Maidman was a novice who was totally unaware of the LSTA and did not understand the ramifications of conducting a trade governed by the LSTA, and contending, on

Finally, there is no evidence and Highland fails to provide any explanation as to why it believes that BANA's effort and attempt to settle the trade with the proposed waiver, indemnification, and limitation of liability language does not comport with the LSTA's requirement that the trade be settled "on the basis of a mutually agreeable alternative structure or other arrangement that affords Buyer and Seller the economic equivalent of the agreed-upon trade." Highland repeatedly states in conclusory fashion that BANA was required to close the trade as an economic equivalent but does not explain what that would entail.

Moreover, as already noted, the evidence establishes that both parties considered the inclusion or exclusion of the disputed language in the assignment documentation and the December 18, 2009 proposal to include additional language in the trade confirmations to be critical and were unable to agree on this point.  Thus, even if paragraph one of the LSTA applies, it is unclear how the parties could have ever succeeded, regardless of their efforts or intentions, to reach a "mutually agreeable alternative structure or other arrangement" that would have afforded them both the economic equivalent of the Regency Loan trade.  The court therefore concludes that Highland failed to raise a genuine dispute of material fact regarding its preliminary contract claim, and BANA is entitled to judgment on this claim.

**V.      Highland's Motion to Strike BANA's Notice of Supplemental Authority**

Highland moves to strike BANA's Notice of Supplemental Authority, filed May 7, 2013. Highland contends in its motion that BANA filed the Notice of Supplemental Authority after briefing

---

the other hand, that BANA intentionally attempted to squelch the Regency Loan trade and avoid the economic consequences of closing it under the LSTA as something other than an assignment when Maidman learned that the Regency Loan would pay off at par.  If Maidman was unaware of the LSTA provision requiring that a transaction be closed as something other than an assignment, it would seem that he would not have had any reason to avoid closing the Regency Loan trade as something other than an assignment.

on its summary judgment was complete on April 26, 2013, and attached the unpublished opinion in *CAC Group, Incorporated v. Maxim Group LLC*, decided by the Second Circuit on May 2, 2013, without seeking leave of court or showing good cause for the requested supplementation in accordance with Local Rule 56.7.

BANA counters that it telephoned the court's chambers before filing the notice to determine procedurally the manner in which it should provide the notice of supplemental authority. In support of its response, BANA attaches the declaration of attorney Megan Dagerman to show that it consulted with the court before filing the notice. BANA therefore contends that it complied with Local Rule 56.7's requirement that a party obtain the presiding judge's permission before filing supplemental pleadings, briefs, authorities, or evidence. If it is determined that BANA ran afoul of the court's local rules, it requests that it be permitted to cure the procedural misstep.

Local Civil Rule 56.7 provides: "Except for the motions, responses, replies, briefs, and appendixes required by these rules, a party may not, without the permission of the presiding judge, file supplemental pleadings, briefs, authorities, or evidence." The court generally discourages attempts to file supplemental authorities if the authorities were previously available when a party submitted its motion, response, or reply brief. When supplemental authority issues after briefing is complete, however, the court will generally permit a party to file a notice of supplemental authority without seeking formal leave of court. Moreover, Rule 56.7 does not require as a prerequisite that "good cause" be shown for the requested supplement; rather, whether a party will be permitted to supplement is entirely within the presiding judge's discretion.

As Highland notes, the case cited by BANA follows and applies reasoning similar to that previously applied by the Second Circuit in other cases. For this reason and because BANA's one-

**Memorandum Opinion and Order – Page 48**

page Notice of Supplemental Authority merely attached the opinion without making any arguments as to its relevance or import, the court concludes that Highland will not suffer any legal prejudice by the court's consideration of the case.  The court will therefore deny Plaintiff's Motion to Strike Notice of Supplemental Authority in Support of Defendant's Motion for Summary Judgment.

## VI.   Motions to Exclude Expert Testimony and Discovery Motions

In light of the court's determination as to BANA's summary judgment motion and BANA's objections to Highland's summary judgment evidence, it need not address the parties' respective motions to exclude expert testimony under Federal Rule of Civil Procedure 702 or BANA's discovery motions.[19]  The court will therefore vacate the orders of reference as to these motions and deny them as moot except to the extent herein addressed by the court in conjunction with Defendant's objections to the expert reports of Ms. Taylor.

## VII.   Conclusion

In concluding, the court determines that the evidence in the record is insufficient to raise a genuine dispute of material fact that a contract existed based on any theory advocated by Highland. The evidence on which Plaintiff relies is taken out of context, and an attempt is made to ascribe meanings or interpretations to which the evidence is not reasonably susceptible and to which a jury could not reasonably infer that a genuine dispute of material fact exists regarding the existence of a contract based on the theories advocated by Highland. Accordingly, BANA is entitled to judgment as a matter of law.  The court therefore **grants** Defendant Bank of America, N.A.'s Motion for Summary Judgment (Doc. 53) and **dismisses with prejudice** this action.  For the reasons herein

---

[19] Unlike Highland, BANA did not rely on its expert's opinions, testimony, or reports in support of its summary judgment motion.  Accordingly, Highland's motion to strike BANA's expert testimony does not affect the court's ruling as to BANA's summary judgment motion.

**Memorandum Opinion and Order – Page 49**

discussed, the court **denies** Plaintiff's Motion to Strike Notice of Supplemental Authority in Support of Defendant's Motion for Summary Judgment (Doc. 86).  In light of the court's determination as to Defendant's summary judgment motion, the court **vacates** the orders of reference as to Plaintiff's Motion to Partially Exclude the Expert Testimony of Stephen Ewald (Doc. 80), Defendant Bank of America, N.A.'s Motion to Exclude the Expert Testimony of Allison Taylor (Doc. 81), Defendant Bank of America, N.A.'s Motion to Compel Highland Capital Management, L.P. to Produce Documents and Resume the 30(b)(6) Deposition (Doc. 91), and Defendant Bank of America, N.A.'s Motion for Leave to File Reply Appendix in Support of Motion to Compel (Doc. 113), and **denies** them **as moot** except to the extent herein addressed in conjunction with Defendant's summary judgment objections to the expert reports of Allison Taylor.  The court will enter a judgment in favor of Defendant by separate document pursuant to Rule 58 of the Federal Rules of Civil Procedure.

      **It is so ordered** this 23rd day of August, 2013.

*Sam A. Lindsay*

Sam A. Lindsay
United States District Judge